Philip G. WATERS et al., Appellants,

v.

Arnold H. BRUNER et al., Appellees.

No. 13877.

Court of Civil Appeals of Texas.

San Antonio.

Feb. 7, 1962.

Rehearing Denied March 7, 1962.

Whitlow & Cole, Victoria, George Fred Rhodes, Port Lavaca, for appellants.

Guittard & Henderson, Victoria, John T. Vance, Callaway S. Vance, Edna, Howard G. Hartzog, Port Lavaca, Turner, White, Atwood, McLane & Francis, Lyne, Blanchette, Smith & Shelton, Dallas, Fischer, Wood, Burney & Nesbitt, Corpus Christi, for appellees.

MURRAY, Chief Justice.

This suit was instituted in the District Court of Calhoun County, Texas, by Philip G. Waters and his wife, James Alan Waters, of Harris County, Texas, B. K. Woodward, Jr., and wife, Jimmie Woodward, D. J. Jordan and wife, LaVerne Jordan, and Ray Revel and wife, Charlene Revel, all of Jackson County, Texas, against Arnold H. Bruner of Dallas County, Texas, Hugh J. Fitzgerald of Travis County, Texas, Cullen B. Vance and wife, Carrie Lou Vance, of Jackson County, Texas, and Coastal States Gas Producing Company, a corporation, seeking to impress a constructive trust on the production from a gas and distillate well located on Lot 107, Unit 2, of Port Alto in Calhoun County, Texas, and for resulting damages because of an alleged breach of attorney-client relationship and a civil conspiracy, and to effect an equitable pooling by estoppel of Lot 107 with Lots 106 and 108 of Unit 2. The trial court did not submit the case as to Arnold H. Bruner, Hugh J. Fitzgerald and Coastal States Gas Producing Company, but rendered judgment in their favor as a matter of law. The trial court did submit to the jury, in some nineteen special issues, the case of the plaintiffs against Cullen B. Vance, some of which issues were answered favorably to Vance and others unfavorably to him.

The plaintiffs made a motion for judgment on the verdict, which was overruled. The defendant Vance made a motion and amended motion to disregard some of the jury findings, which were also overruled. The court then rendered judgment that plaintiffs take nothing against Vance, and the plaintiffs appealed.

Appellants' first point is as follows:

"The trial court erred in overruling Appellants' Motion for judgment upon the Jury's verdict as rendered."

It will be noted that in their motion appellants did not ask the court to disregard any finding of the jury in answer to any special issue, thus leaving the jury's

findings which were against them in full force and unchallenged. Rule 301, Texas Rules of Civil Procedure, requires a motion and reasonable notice to the adverse party, before the court may "disregard any Special Issue Jury Finding that has no support in the evidence." Missouri Pacific R. Co. v. Ramirez, Tex.Civ.App., 326 S.W.2d 50; Continental Nat. Bank v. Hall-Page Tire Co., Tex.Civ.App., 318 S.W. 2d 127; Reserve Life Ins. Co. v. Everett, Tex.Civ.App., 275 S.W.2d 713; Service Life Ins. Co. v. Miller, Tex.Civ.App., 271 S.W.2d 301.

The jury found, in answer to Issues Nos. 2 and 3, that the relationship of attorney and client betwen Cullen B. Vance and Waters and Woodward and Revel, in the matter of the oil and gas leases herein involved, had terminated at the time Vance executed his amended lease.

The jury also found, in answer to Issue No. 10, that at the time Vance executed said amended oil and gas lease dated February 28, 1957, by reason of his prior dealings with Waters and Woodward and Revel, Vance was not required to notify them of the fact that he had executed this amended lease.

The trial court could not properly have granted appellants' motion for judgment on the verdict without disregarding these findings by the jury, and the court would have committed reversible error if it had done so. Missouri Pacific R. Co. v. Ramirez, supra.

Notwithstanding what we have said above, the evidence conclusively shows that such attorney and client relationship had terminated at the time of the execution of the amended oil and gas lease by Vance. The evidence shows that Vance had never acted as attorney for any of appellants prior to the time he prepared the three original oil and gas leases on Lots 106, 107 and 108, Unit 2, Port Alto. He was not employed by any one of appellants as his regular attorney. He agreed to draft the three leases so they would have identical provisions, and this he did. After he had done this and the leases were executed and recorded, and the bonus money paid, and Vance paid for his services, there was nothing left for him to do. Appellants never again consulted Vance until after the amended lease was executed by him. Vance testified that after receiving the fees of $15.00 each from Waters, Woodward and Revel, he had no more legal business with them, was not representing them in any way, and this was the only legal business he had ever handled for any of them. Waters testified that the only time he had ever dealt with Vance in connection with this lease was at the time of the original lease transaction, and in executing an amendment in 1955, restoring the shut-in gas well clause which Waters had stricken from the lease. He said that after he paid Vance in August of 1955 he had no more conversation or dealings with Vance up to the time of the drilling of the well. He had consulted other lawyers before, and made other leases. Waters further testified that when Vance handled the lease transaction for him and was paid, his legal services were ended, and he had not authorized him to do anything further; his representation of him was at an end. Waters said that the bill he received from Vance was for "procurement of Port Alto lease."

Woodward testified that he never had any relations with Vance as his lawyer except on the occasion when the lease was made. After the lease was signed and Vance was paid, he considered the transaction ended, and said he had not authorized Vance to do anything further or act on anything else. He said he had business with other lawyers before this lease.

The inference in appellants' brief that Vance represented Woodward and Revel when they purchased the lot is unwarranted. The reference given to the statement of facts shows that Vance handled the sale of the property as a real estate agent for the owners.

The fact that Woodward considered the attorney relation terminated is shown by a letter written by him to the lessee in 1957. He said that he talked to Grasty, who had completed a well on the Hansard lot or lots nearby, and "I wrote Mr. Arnold Bruner and told him that the Grasty well, Gordon Grasty well, on Hansard's property had been completed and I would like to know his intentions as to Lot 108." The reply of Bruner said, "With reference to your letter of January 16, 1957, concerning Lot 108, Unit 2, Townsite of Port Alto, Texas (our Lease No. 365), please be advised that we are watching the progress of the Gordon Grasty well and will probably drill a well on your property in the near future."

Revel also said that this was the first and only time that he dealt with Vance as his attorney. He said he knew about the correspondence carried on by Woodward and was kept currently advised, thus indicating that he also felt that Vance was no longer acting for him in reference to his lot.

Vance testified: "My employment had terminated and each person was free to do whatever he wanted to with his lot. He could sell it, he could mortgage it, he could do anything he wanted to with it, and I felt the same way. I felt perfectly free to deal with my lot independently of them."

Thus it was conclusively shown that the relationship of attorney and client had terminated long before Vance executed the amended lease. After the termination of the relationship of attorney and client, Vance was just as free to do what he pleased with his lot as were the appellants.

■ As to the duty of an attorney to his client after his employment as such has been terminated, it is stated in 7 C.J.S. Attorney and Client § 126-c, p. 963:

"So long, however, as there is no breach of confidence or use of information or knowledge previously acquired in his professional relations, and no unfair advantage is taken of the client, the termination of the relationship of attorney and client leaves the attorney free to acquire or purchase property previously belonging to the client or an adverse title, interest, or claim. Hence the courts in many instances have sustained an attorney's purchase of a former client's property at a judicial or tax sale, or his purchase of outstanding claims against his former client; and an attorney may, after the relationship has terminated, buy the title to property with reference to which he was previously consulted by the client where the client refused to buy the property after receiving correct advice and the attorney's purchase is not the result of confidential knowledge previously acquired."

See, Minchen v. Ament, Tex.Civ.App., 266 S.W.2d 257; Jinks v. Moppin, Tex.Civ. App., 80 S.W. 390; Harrison v. Murphey, 39 Okl. 548, 135 P. 1137, 49 L.R.A.,N.S., 1059; Kauder v. Lautman, 114 N.J.Eq. 197, 168 A. 660, aff. 116 N.J.Eq. 145, 172 A. 565; Smith v. Craft (Ky.), 58 S.W. 500; 20 A.L.R.2d 1309.

It is well to here make a full statement of this case. In 1955, the Vances owned Lot 107, Unit 2, Port Alto, Calhoun County, Texas. To the east was adjoining Lot 106, Unit 2, owned by Waters, and to the west was adjoining Lot 108, belonging to the Woodwards and the Revels. These three lots fronted on Bay Shore Drive and each had a summer cottage erected upon it. Thus these parties, insofar as their summer cottages were concerned, were neighbors. In 1955 there was an 'oil play' in the area of Port Alto. Vance was a lawyer. He was approached by one O. K. Crow, seeking an oil and gas lease upon his lot. Vance asked a bonus of $500.00, a ⅛ royalty, and no provision for pooling. Crow left without agreeing to lease on these terms. Later he returned and suggested some pooling whereby each lot would receive a ½₂ royalty in the event

of · pooling. On his first visit Crow inquired if there were any other available leases, and Vance said he would inquire of his neighbors. This he did, and found out they were willing to lease, and wanted to lease on the same terms as Vance. Vance agreed to prepare the three leases, containing the same provisions as his lease. All three leases provided for a bonus of $500.00, a ⅛ royalty, and in case of pooling a 1/12 royalty for each lot pooled. The leases were executed, the bonuses paid and the leases accepted by Arnold H. Bruner and Hugh J. Fitzgerald and duly recorded in Calhoun County. Vance was paid the sum of $15.00 each by Woodward, Revel and Waters, for his services in procuring and preparing the leases. Appellants seem to contend that Vance stated the three leases would always remain identical, except of course the name of the parties and the description of the lots. There is no evidence to this effect. Waters had struck out a provision in his lease as to shut-in oil · wells, but later executed a new lease restoring this provision. These leases were dated August 16, 1955. They were continued in effect at the end of one year by the payment of $100.00 per lot as delay rental. The parties were all well pleased with the deal.

In January, 1957, a well was drilled on Lot 110, which was one lot west of Lot 108, owned by Woodward and Revel. Thereafter, Woodward wrote to Arnold Bruner about that well and inquired when he was going to drill on his lot. By letter dated January 24, 1957, Bruner replied as hereinbefore set out. About a week later, Woodward showed this letter to Vance.

Vance did nothing about the matter until he was called by one Williams, an agent of Bruner, on February 15, 1957, some nineteen months after the execution of the leases. Williams told Vance that they wanted to drill on his lot but could not drill on a ⅛ royalty and wanted to know if he would reduce his royalty to a ⅛. It was then that Vance, on March 24, 1957, executed · an amended lease providing for a ⅛ royalty instead of a ⅙, and further providing that his lot was not to be pooled with adjoining lots.

Thereafter, on May 31, 1957, a well was drilled upon Vance's Lot 107. The surface of all three lots was used in drilling this well, but there was no pooling. If lessees had pooled the three lots they would have been required to pay a 1/12 royalty to each lot owner or a 3/12 royalty, while by not pooling they were required to pay only a ⅛ royalty. If they had pooled the three lots the added surface would not have increased the allowable on the well very much.

There is nothing in this record to show that in executing the amended lease Vance committed any fraud upon appellants, or used any confidential information that he had obtained by reason of his employment as their attorney to secure the original oil leases. He agreed that he would make the provisions of appellants' leases the same as his. This he did, and the leases were the same as his. After the leases were executed and recorded he did not possess any confidential information that he or anyone else could not have gained by the reading of the leases as recorded in the public records.

■ There is no evidence that Vance ever told appellants that their leases would always remain identical with his. There is no contention that he ever represented that his lease would remain identical with theirs. Even if he did make such a statement, it was made as to what would happen in the future. There is no evidence that he made it fraudulently without any intention to keep such promise, or made it at the time to defraud appellants. It was not in the form of an agreement, appellants did not feel that they had promised never to change their leases, but felt free to do as they pleased with them. To be binding such an agreement would have to be in writing. There is no contention that it was understood that such a provision was to have been placed in each

of the leases. Under the undisputed facts in this case, the relationship of attorney and client having terminated, Vance was free to execute the amended lease if he so desired.

Vance's failure to disclose to his neighbors that there was no pooling did not change the situation in any way. After Vance had executed the amended lease and after the lessees had decided to drill on Lot 107, nothing could have been done by Vance or any of the lessees to change the situation. Appellants' first point is overruled.

The appellants further contend that the judgment should be set aside and the cause remanded because there was misconduct of the jury, improper argument made to the jury, and because of conflicts in the findings of the jury. We overrule these contentions because we feel the court was right in rendering judgment in favor of Vance as a matter of law, and that the above questions therefore become immaterial. Likewise, believing that Vance had a legal right to execute the amended lease, the court properly granted judgment as a matter of law in favor of Bruner, Fitzgerald and Coastal States Gas Producing Company.

We think the real reason appellants feel they have been defrauded is the proration rule that exists in the Port Alto area which permits a person to secure a lease on one fifty-foot lot and produce oil or gas therefrom without pooling with the surrounding lots. So long as gas may be produced in this field upon such basis, producing companies will no doubt take advantage of such proration rule. It seems that in the future this kind of proration may not be permitted in view of the Normanna case of Atlantic Refining Co. v. Railroad Commission of Texas, Tex., 346 S.W.2d 801.

As above stated, the trial court did not err in rendering judgment in favor of Bruner, Fitzgerald and Coastal States Gas Producing Company. Under the original leases, the question of pooling was optional with them; they were in no way required to pool the three lots if they did not desire to do so. They would have been foolish to have pooled them and paid $\frac{3}{12}$ royalty instead of $\frac{1}{8}$. There was absolutely no evidence that they had been parties to a civil conspiracy and that appellants had suffered compensable damages as a result thereof. They could not be compelled to respond in damages for doing that which they had a legal right to do. Fletcher v. Huffman, Tex.Civ.App., 149 S.W.2d 313. There is nothing to show that appellants were entitled to recover upon a pooling by estoppel theory. The pooling provisions were elective with the lessees. Kinnear v. Scurlock Oil Co., Tex. Civ.App., 334 S.W.2d 521. Equitable pooling is not recognized in Texas. Ryan Consol. Petroleum Corp. v. Pickens, 155 Tex. 221, 285 S.W.2d 201; Harris v. Wood County Cotton Oil Co., Tex.Civ.App., 222 S.W.2d 331.

The judgment is affirmed.